Linda Bays
1698 Nickles Rd.
Kettle Falls, Wa. 99141
(509) 738-2893

# U.S. DISTRICT COURT FOR THE EASTERN DISTRICT FOR STATE OF WASHINGTON

| | |
|---|---|
| Linda Bays,<br>    Plaintiff<br>VS<br><br>CITY OF KENNEWICK,<br>KENNEWICK POLICE DEPT,<br>KENNEWICK PROSECUTORS OFFICE,<br>BENTON COUNTY JAIL,<br>BENTON COUNTY DISTRICT COURT,<br>OFFICER DAN TODD,<br>OFFICER JOE JACKSON,<br>ASSISTANT CITY ATTORNEY,<br>CODEE L. McDANIEL,<br>JOHN and/or JANE DOES | NO. **2:17-CV-310-TOR**<br><br>COMPLAINT |

## JURISDICTION

This Court has jurisdiction under 18 US Code, section 1965, 42 US

RECEIVED
SEP 0 1 2017
CLERK, U.S. DISTRICT COURT
SPOKANE, WA

code, section1988, 42 US Code, section 1983, 18 US Code, section 1343, Code, 18 US, section 1349, and under the Fourteenth, first, fourth fifth, sixth, seventh Amendments to the US Constitution.

## PARTIES

(1) Linda Bays is a party and has at all times lived in Stevens County at 1698 Nickles Rd. Kettle Falls, Washington.

(2) City of Kennewick is a Municipal corporation party and is located in Benton County, Washington

(3) Kennewick Police Department is a part and known to me at all times located at 211 W. 6th ave. Kennewick, Washington.

(4) Kennewick City Attorney's office is a party and located at 210 6th Ave. Kennewick, Washington

(5) Benton County Jail is a party and located at ……

(6) Benton County District Court is a party and located at 7122 Okanogan Pl., Building A., Kennewick, Washington 99336

(7) Officer Dan Todd is a party employed by Kennewick Police Department

(8) Officer Joe Jackson is a party employed by Kennewick Police Department

(9) City District Attorney, Codee McDaniel is a party employed

Page 2

by Kennewick City Attorneys Officer

## **FACTS**

(1) On Labor Day Weekend in 2014, I went camping at Pack wood with my family who owned property there on the river. I took my neighbor, Bill Klinger, with me because he has no family of his own. He is left alone a lot because of his antagonistic views so I try to include him when I can.

(2) On September 2nd, we all left to go to our homes. My neighbor was driving my car.

(3) I had been sick and without my Prozac for days so my nerves were are edge.

(4) I wanted to stop in Packwood (on the bottom of the west coast of White Pass.) I wanted to get something to eat and some coffee before coming home.

(5) My friend refused to stop to get something to eat at a restaurant so I got upset with him. 200 miles to home meant we were going to be on the road for at least 4-5 hours, and I need food.

(6) 

(7) When we got near Richland, I reminded him I had planned on stopping to see my adult Foster Daughter who worked in the

attorney generals office. My platonic friend told me he was not going to stop and that I could come see her another time.

(8) My friends attitude did not set well with me since I had paid for the trip for both of us and he was driving my car.

(9) When we got to Kennewick exit, Bill Klinger pulled my car over to get gas at Circle K gas and convenient store.

(10) When my friend asked me for my credit card to pay for the gas, I told him I was going to see Sandy whether he liked it or not and told him to give me the keys to my car.

(11) I refused to give him my credit card, and went to get my cell phone out of my purse to call Sandy and tell her I was in town. My cell phone was not in my purse and Mr. Klinger would not give it back to me or let me use his phone. He just laughed at me.

(12) I was so upset that I went into Circle K and asked to use their phone to call the police and they let me use it.

(13) I called the police and advised the 911 dispatcher that my friend would not give me my car keys or my cell phone and wanted assistance to make him give it to me.

(14) When the officer got there, I told officer Todd that I wanted my keys and my cell phone back. I explained to him that this was my trip that I was paying for, and that the car was mine, and I had a valid drivers license and was capable of driving.

(15) Officer Todd asked my friend for the keys and then my

friend asked officer Todd if he could speak to him in private and they went off to talk.

(16)   When they got back, Officer Todd told me to let my friend drive my car and let him take me home. I told him I was over 21 years old and could make up my own mind and I was going to see my foster daughter before I left Tri-Cities. Then officer Todd said, "Why don't you just be a good little girl, and let your friend drive you home."

(17)   Officer Todd's remarks were insulting since I am a senior citizen and not a "Little girl" who needs somebody to do my thinking and tell me where I could and could not go.

(18)   I suffer with urgent incontinence and the stress of this situation made me have to go to the bathroom. I left to use the Circle K bathroom and when I got back, my car had been moved from in front of the gas pump to the side of Circle K parking lot. I went to my car, and I was locked out of my own car and my keys were no where in sight.

(19)   There was a man at the pump and I asked him if he saw who moved my car and he told me the man talking to the officer had moved it. I asked him where that man went and he told me he went with the officer.

(20)   I'm locked out of my car, and that did not help at all. I started having more anxiety than what I was already experiencing.

(21) When I get too much anxiety, I cannot control the volume of my speech because the muscles in my throat tighten too and I have to strain to get my words out.

(22) I went back into Circle K and asked them if she would call 911 for me again. I told the dispatcher that the police officer had left with my friend and my car keys, stranding me at Circle K without transportation and locked out of my own car. I told them I wanted my car keys back from the officer. I was told to wait.

(23) I waited what seemed forever and my anxiety got worst until I felt like I was in a full fledged anxiety attack. I asked the girl at Circle K if she would dial 911 for me again. I told the dispatcher I was getting sick and she asked me to wait some more after I refused a ambulance. All I wanted was my car keys so I could leave.

(24) The dispatcher told me to wait outside of the Circle K for the police officer. When I later got the audio recording of that 911 call, the dispatcher was talking to the store clerk and asking her if I was disturbing the peace, and was only told I was loud and upset.

(25) At no time was I rude or disrespectful of the clerks.

(26) I could not walk because I am crippled and cannot walk very far at all. I was sitting outside like the dispatcher told me to, and I walked around to the drive-in window of Circle K and asked the

cashier to please call 911 for me one last time. This time I told the Dispatcher I had to leave and I was going to call my towing insurance and have them tow me to a motel until I could get a lock smith to open my car and make me new keys.

(27) The Dispatcher asked me why I went back into the store when she told me to wait outside, and I explained I was waiting outside. I told her I had come to the drive up window outside to ask the clerk to be connected again to 911. The clerk connected me to 911.

(28) The Dispatcher said the officer was on his way and to wait so I waited some more where I had been quietly waiting outside of the store.

(29) At no time did anyone at Circle K ask me to leave.

(30) I was having medical problems and I had no keys to my car, and did not have the medicine I needed for those problems with me. I desperately needed help and I thought help was on its way.

(31) When Officer Jackson arrived, I thought he was going to help me. But officer Jackson had other plans and those plans were to deny me the right to travel to see my foster daughter. I told him my story and then he went into Circle K to talk to them.

(32) When Officer Jackson came back outside, he told me I was under arrest for criminal trespassing. I asked him, "What elements of criminal trespass have I violated? Instead of telling me what

the elements of the crime I had violated were, or even say there was a complaint, he said,

"Are you just resisting arrest?"

(33) I stood up straight and dropped my cane as I raised my hands in the air, and replied, "No Sir."

(34) Officer Jackson wanted to handcuff me and I asked him to please not do that because I had tears in my shoulder and it would be quite painful for me.

(35) Nevertheless, Officer Jackson handcuffed me behind my back and let me suffer more by locking me up in his hot smoldering car for what seemed like an hour or more.

(36) Finally another police car drove up and officer Jackson got out and came and opened up my door and said to me, "Are you going to be a "good little girl" and go home with your friend or do you want me to take you to jail?"

(37) I told him I was going to see my foster daughter before I left the area. I also told him, he could not take me to jail because he had not read me my Miranda rights YET. Officer Jackson just laughed at me, closed the door again and went to talk to the other police officer for a while.

(38) When officer Jackson came back he got into the drivers side of his cruiser and took me to jail, where I was booked, photographed and fingerprinted. Many times I had to be

fingerprinted because I am so worn out my fingerprints were worn out and hard to get.

(39) Nobody bothered to read me my Miranda rights.

(40) I was allowed to use the phone but I could not call my foster daughter from jail. She works in the attorney generals office, and I was embarrassed to call her from jail at her work, so I sat there and suffered.

(41) By the time I got to jail, I was really hungry, not having eaten all day. I was put in a holding tank with nothing but cement floors and a toilet. There was no furniture at all and they would not let me have my cane. I sat on the toilet which was very uncomfortable until some other women were put in the cell with me. Then I had to sit on the floor.

(42) When those other women got a meal, I did not get a meal. I asked if I could get some dinner and the jailer told me I had already had my dinner. I don't know what paperwork went in on me, but it must have been horrible because I was treated inhumane.

(43) I asked for the medicine I needed and I had my medical records with me that showed what my prescriptions were. The jailers refused to give me any medicine that I really needed while I was in jail.

(44) As I recall, some of the woman were waiting to be released

and that is why they were in the holding cell with me. One of the women told me she would call and get me help the next day, because they all saw how badly the jailers treated me. Then all the women were taken out at the same time and I was left alone for the night on a hard cement floor with no blanket or a mattress.

(45)   I had told the jailers about my disability and they mostly ignored me. I was right across from their station in that holding tank. I told them I could not sleep on a cement floor without damage but they did nothing to ease my distress.

(46)   The next morning, September 3, 2014, I hurt so bad, I could hardly stand it. I had to go to the bathroom, and I could not get up on my own. I explained to the jailers I needed help but they would not help me get up and I accidentally soiled myself. Then I soiled myself again and took off my soiled pants to attempt to clean myself up and threw my soiled depends and the pants away from me. One jailer got mad and told me to put it back on, but I refused.

(47)   Pretty soon, a nurse came and told me she had been called to check on me. I asked her to help me get up and she asked a male jailer to help her as she was smaller than me. That jailer said, "Why are you helping her? She is in here for criminal trespass!"

(48)   Nurse Linda got me up and made them feed me because I told her they would not feed me. She also got me clean depends

and pajama bottoms.

(49) Approximately 24 hours after arriving, I was taken to have arraignment. The district court Judge asked me if I wanted a lawyer. I told her I wanted a lawyer, but would not accept a public pretender.

(50) I already knew the police officer was only pretending I actually committed a criminal offense of criminal trespass, and I was dumbfounded that he had actually took me to jail without the fact of the two necessary elements of criminal trespass to be a crime. Neither of those elements were present and I was outside, sitting quietly, in front of Circle K place when the officer came.

(51) Because I called a public defender a public pretender, the judge got mad at me and told me I was rude, and that I could get another day in jail to think about it. I have seen the public defenders in my own county, and even those qualified to represent the citizens who cannot afford counsel will not see their clients until the day of trial and they will not call witnesses who were privy to the facts and competent to testify.

(52) In my opinion they are public pretenders when they do not represent their clients zealously and don't talk to their clients until the day of trial.

(53) When I was taken back to jail, I saw a friend of my grandsons, and it was so embarrassing that she saw me in jail,

even though she was in jail herself. It was embarrassing for my grandson too. Old women don't go to jail, particularly law abiding old women like I have tried to be.

(54) Later my arrest was published on the internet which caused me to be shunned in my own community.

(55) When I returned to jail from seeing the arraignment judge, I saw Nurse Linda again too. I suspect she was responsible for me being called back to see the judge again later that day at about 5p.m. in the evening. That time the judge just released me on a PR after I had already spent about 30 hours in jail.

(56) I went to pick up my belongings and was surprised to see my cell phone on the list of belongings at the jail. I had dumped my purse out twice and it was not there. That proved my friend had taken my cell phone to provoke me more than he was already doing. I believe the officer who left with my friend and my car keys did get my cell phone back and put it in with my belongings later.

(57) I did not get my car keys until days after I got home. My caregiver found them on one of my fence posts in the front yard. The officer allowed my friend to keep the car keys and take them home. He even assisted in my friend hitchhiking home.

(58) I was also missing an ancient hand carved jade pipe from my purse that was quite valuable. After my case was dismissed, I

asked for it back, and they refused to give it to me, claiming it had been destroyed. I do not believe it was destroyed as anyone could see it was an object of antiquity and not it was not illegal for me to have it.

(59) I called my foster daughter and she came and picked me up and took me to her home. I told her I could call my towing insurance and have my car towed over to her house so I could get a lock smith. My foster daughter told me it was too bad I did not have AAA plus. I told her I did have it, and my foster daughter told me they would make keys for me. I did <u>not</u> know they made keys too, or I would have called them instead of 911 when I could not get access to my car.

(60) I called AAA and my foster daughter took me to meet them at my car where AAA opened my door for me and made me a new set of keys.

(61) I drove back to my foster daughters house where I spent the night after being able to shower the smell of waste products off my body.

(62) I live approximately 200 miles from Kennewick. On my first hearing, I traveled to Kennewick and was happy to see I was second on the docket. I was not called and was held over until last, and then my case was continued. I had traveled 400 miles or more for nothing!

(63) I put in a discovery request for the audio recordings of the four 911 calls and I told the city attorney those recordings would prove I did not commit any crime.

(64) When the city attorney heard the tapes, she decided to continue to prosecute me on the false charges of criminal trespass, which was malicious prosecution under color of law.

(65) When I got the first CD of the 911 calls, I went to see a friend of mine who was a court reporter to transcribe that record for me into hard copy. I did not listen to the tapes before my friend put them into her machine. I was upset to hear the mumble jumble of the recordings all together so that it could not be transcribed.

(66) The next hearing, I told the judge I had not gotten the right recordings of the 911 calls I requested and she told the city attorney to give them to me again. Again I got a 2nd CD recording that had no 911 dialog whatsoever on it. It had music, nice music, but no 911 dialog.

(67) I Had another hearing, and requested the recordings again, and the third time, the recordings were sent, I finally got a correct copy of the four 911 calls I made.

(68) On the fourth hearing, I expected to have my motions for witness fees, and for expert witness fees heard. I needed an expert witness about my anxiety disorder, because I was not yelling as

alleged by the police, My muscles tighten and my voice gets a little louder, but I do not yell except when I yell for my dogs.

(69) While I was waiting, a public pretender came up to me and told me he was my attorney. I told him I was my own attorney, and he advised me the judge called him and wanted him to represent me. I told him I had those motions noted to be heard that day and asked him if he wanted to present those motions for me. (I was checking to see if he was a lawyer or a public pretender.)

(70) When the public pretender told me he had not yet read my motions, I handed him the two motions. Neither was more than half a page as I recall. He refused to read them, so I asked him to look me in the eyes. He looked and I asked him if he would ever bring forth those motions for me, and he said, "NO." I told him he could not represent me. The judge refused to hear my motions that day and continued the hearing after threatening me three times with contempt of court if I did not accept her public pretender. I did not cave as I had seen that pony show before.

(71) For example, I saw several people get arrested for obstruction of justice when they asked a police officer why they were being arrested for the alleged crime. That is why I knew to raise my arms when the officer asked me if I was resisting arrest. There is no doubt in my mind that officer Jackson was going to arrest me for obstruction of justice if I had insisted he tell me what

I had done to meet the elements of the crime, when he asked me if I was resisting arrest. Officer Jackson was setting me up for a convictable crime because I had not trespassed at all.

(72) At that time, it had not been too long when a friend of mine was falsely arrested and when she got a real attorney, the false arrest charges were dropped as there was no need to arrest her. When the police told my friend she was under arrest, she asked them why, and they not only charged her with a crime she did not commit, they charged her with obstruction of justice for resisting arrest. Her attorney got the false charges dropped but they made her plead guilty to the charge of obstruction of justice. Crazy!

(73) I had contacted the deputy city attorney, Codee McDaniel, and told her I could come a day early on the next 5th pre-trial hearing or I could come a day before. I had to have one of those days to interview the city's witnesses against me.

(74) Codee McDaniel told me she was not going to let interview the witnesses. I told her I had the right under law to interview the witnesses against me before trial. Ms. McDaniel told me she was dismissing the case with prejudice, and that I did not have to attend any more hearings.

(75) When I got the dismissal, a true and correct copy of which is attached hereto as **Appendix "A"**, it made me smile because it stated my case was being dismissed because I would not accept

counsel and I was not able to defend myself. That was not true and the City attorney knew, as well as the police knew, I had not committed a crime and they would not be able to get a jury to convict me since I would know what jury instructions to issue to the jury. There are only two elements to convict on the crime of criminal trespass, and neither element was in the present case. Moreover, I was trying to leave, and the Dispatcher kept insisting I wait for the officer. If there was any criminal trespass the dispatcher was aiding and abetting the crime by telling me to wait.

(76) I suffered abuse at the hands of those who we hire to protect us and our rights. All municipal corporations in Kennewick together with all departments and officers of said departments apparently have the habit and policy of pursuing false criminal charges and denying people due process of law and equal protection under the Fourteenth Amendment.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
FALSE ARREST & FALSLY JAILED under color of law

### SECOND CAUSE OF ACTION

Pain & Suffering from the humiliation of being arrested+ and treated like a criminal

**THIRD CAUSE OF ACTION**

ELDER ABUSE & HUMAN RIGHSTS VIIOLATIONS.

**FOURTH CAUSE OF ACTION**

FOURTEENTH AMENDMENT violations with deprivation of both civil rights and constitution rights, including, but not limited to, the right to police protection, the right to be treated with dignity, the right to liberty and the right to travel.

**FIFTH CAUSE OF ACTION**

MALICIOUS PROSECUTION. When city attorney, Ms Daniels, heard the 911 calls she SHOULD have dismissed the Criminal Trespass charges .against me. Instead, she chose to continue with the false charges.

**SIXTH CAUSE OF ACTION**

**SEVENTH CAUSE OF ACTION**

**EIGHTH CAUSE OF ACTION**

### RELIEF SOUGHT

1. Undetermined amount of pain and suffering monetary relief
2. Undetermined amount of civil rights monetary relief
3. Attorney fees and costs
4. Undetermined amount of monetary relief for Human Rights violations.
5. All and any other relief decided by finder of the facts.

Respectability Submitted on 8-31-2017 by      *Linda Bays*
Linda Bays, in person

PAGE 18

Appendix "A."

IN THE DISTRICT COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF BENTON

| | |
|---|---|
| CITY OF KENNEWICK, | No. 4z0500971 |
| Plaintiff, | MOTION & ORDER FOR DISMISSAL |
| vs. | |
| LINDA BAYS, D.O.B.: 10/16/1946 | |
| Defendant | |

COMES NOW, the plaintiff, by and through Codee L. McDaniel, Assistant City Attorney for the City of Kennewick, and moves that the above-entitled action be dismissed without prejudice based on the record and affidavit provided herein.

DATED this ___ day of February, 2015.

BY: _____
Codee L. McDaniel #42045
Assistant City Attorney

STATE OF WASHINGTON )
                    ) ss
COUNTY OF BENTON    )

1. Codee L. McDaniel, being duly sworn on oath deposes and says that she is an Assistant City Attorney for the City of Kennewick and makes this affidavit in that capacity;

2. Affiant is familiar with the file and record herein;

3. The above-named defendant is accused of Criminal Trespass Second Degree occurring in the City of Kennewick on September 2, 2014;

4. The City will be unable to effectively prosecute this case due to a myriad of issues created by the defendant. Namely those issues center on the defendant refusing the assistance of court appointed counsel and her insistence in representing herself despite her inability to do so effectively. Thus, in light of these factors, the City believes that dismissal without prejudice is appropriate at this time.

BY: _____
Codee L. McDaniel
Assistant City Attorney

SUBSCRIBED AND SWORN to before me on February ___, 2015, by Codee L. McDaniel.

_____

MOTION & ORDER FOR DISMISSAL
Page 1 of 2

Lisa M. Beaton
Kennewick City Attorney
210 W. 6th Avenue
PO Box 6108
Kennewick WA 99336
(509) 585-4274
Fax: (509) 585-4424

Notary Public in and for the State of Washington
Residing at Richland, WA
My Commission Expires: 12/9/16

### ORDER

Based on the foregoing motion and affidavit, it is hereby ordered that the above-entitled cause be dismissed without prejudice.

DONE BY THE COURT this _11_ day of _February_, 2015.

_____
JUDGE/COURT COMMISSIONER

MOTION & ORDER FOR DISMISSAL
Page 2 of 2

Lisa M. Beaton
Kennewick City Attorney
210 W. 6th Avenue
PO Box 6108
Kennewick WA 99336
(509) 585-4274
Fax: (509) 585-4424